JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from a verdict following a bench trial before Judge Burt W. Griffin, finding appellant Domanic Green guilty of one count of aggravated robbery, a felony of the first degree. He claims that prosecutorial misconduct, in withholding police notes of several victim interviews, tainted the fairness of his trial, and mandates reversal; that insufficient evidence was presented to support his conviction; and that the guilty verdict was against the manifest weight of the evidence. We affirm.
 {¶ 2} From the record we glean the following: B.B.,[1] a juvenile at the time of the events in question, and Green were good friends and lived in neighboring houses on Wood Road in Cleveland Heights. B.B., about six feet two inches in height, claimed that, on the evening of March 12, 2001, Green, who is six feet five inches in height, suggested that the two call a nearby Papa John's Pizza and order a pizza to be delivered to a vacant house at 1540 Middleton Road so that they could rob the delivery person. B.B. said that Green chose the house, within a short walking distance from Wood Road and near a wooded area and private drive adjoining Oakwood Country Club, because its location could provide them with cover and a good getaway route. Moreover, he said that Green suggested the robbery, told him it was easy to do and a quick way to get some money, and "pumped [him] up," encouraging him to take part.
 {¶ 3} Because B.B. knew that someone using the same basic plan as the one Green proposed, had used a gun to "stick up" a delivery person from a nearby Marco's Pizza at the same vacant house on March 9, 2001, he assumed Green was the perpetrator of that crime, although he did not aver at any point that Green explicitly admitted to it.[2] Boris Kantarovich, the victim of that robbery, claimed that, while attempting to deliver an order, an African-American male in his 20's, anywhere from five feet eight inches to six feet tall[3] with a hood over his head, held him up using a black gun. The assailant took about $100 and ran down the Country Club driveway.
 {¶ 4} B.B. admitted that he allowed Green to use his mother's cell phone to call a Papa John's between 8:30 and 9:00 p.m. on March 12, 2001, to order a large pizza. They took baseball bats from Green's garage, hid in bushes near to the Middleton Road house and jumped out when the delivery man, later identified as Argem Petrenko, walked up to the porch and knocked on the door. B.B. claimed that Green stepped forward and demanded Petrenko's money and took it, and that both he and Green ran down the Country Club drive, back to Wood Road. There they divided up the proceeds, which B.B. and Petrenko both testified was somewhere between $180 and $190 in cash.
 {¶ 5} When questioned, Petrenko stated that, as he was knocking on the door at 1540 Middleton Road, two African-American men, wielding baseball bats in a threatening posture and wearing blue and white bandanas over their faces, jumped out of bushes near the house. Although he was unsure of how tall the men were who robbed him, he told an officer who interviewed him that night that he thought the man who took his money was no more than six feet in height.
 {¶ 6} B.B. admitted that he and Green robbed an Amazing Wok delivery driver on March 22, 2001. He said Green called the restaurant from a pay phone and requested a delivery to 3718 Blanche Road, near Middleton and Wood Roads and the Oakwood Country Club, and they carried out this robbery in the same manner as before. While Green stood back a little way, B.B. said he took the food and demanded that the delivery man, later identified as Qingsong Yang, place his money in the bag. Then the pair ran away.
 {¶ 7} Yang claimed that as he approached the front steps of the house, an African-American male, about five feet ten inches to six feet tall with a red bandana over his face, wearing a baseball hat and holding a baseball bat in a threatening manner, confronted him and demanded the food and his money, so he gave him $150 in cash. He also said that another African-American male may have been waiting for his assailant in a car parked on Blanche Road.
 {¶ 8} It seems the next day B.B. and Green had some sort of argument that resulted in B.B. deciding he was not going to further associate with Green.
 {¶ 9} In the early hours of March 24, 2001, Stephen Wismar, working for a Papa John's Pizza in University Heights, attempted a delivery to a person with B.B.'s surname at "1636 Oakwood," who gave B.B.'s mother's cell phone number as a reference.[4] Wismar found Oakwood Drive, adjacent to the Oakwood Country Club driveway connected to Middleton Road, but unable to find a 1636 address, and went to a pay phone to call the restaurant. The person who had ordered the pizza telephoned Papa John's earlier to advise that he had seen Wismar's car but it had passed him, so Wismar went back to Oakwood Drive. He said that an African-American male, about thirty- to thirty-five years old, about six feet two inches tall and wearing a coat with "a multi-colored square pattern," flagged him down at the driveway of 1541 Oakwood Drive. When he got out of his car with the pizza in a dark green warming bag, the man pulled a revolver from his waistband, told Wismar to drop the pizza and to give him all his money. Wismar dropped the warming bag and his wallet with between $20 and $25 onto the ground and drove away. He did not notice where his assailant ran after robbing him.
 {¶ 10} On March 26, 2001, B.B. claimed that he and Green reconciled, and that Green confessed to the armed robbery of Wismar, showed him the house in front of which the robbery had taken place, pointed out the bush behind which he had hidden the green warming bag, and bragged he netted $250 from the robbery.
 {¶ 11} That night, B.B. attempted a solo armed robbery of a food delivery driver at 3718 Blanche Road, the scene of the March 22nd robbery of Yang. As he approached the house the driver learned that its occupants had not ordered food; he therefore called the police. When Police Officer Brian Loretz arrived, he noticed B.B. hiding behind some nearby bushes. When B.B. tried to escape, Officer Loretz and Detective Mark Schmitt caught him, wrestled him to the ground and arrested him. Around his neck, B.B. had a blue and white bandana tied so that he could also use it to conceal his face. Retracing B.B.'s path in the snow, Detective Schmitt discovered a baseball bat on a back porch of a residence on Bainbridge Road and confirmed that it did not belong to the owner of that house. In a written statement given to police after his arrest, B.B. admitted that Green had given him the bat several days before for use in the robbing of food delivery personnel and that he had attempted to hide the bat on Bainbridge Road porch.
 {¶ 12} On the strength of B.B's statement, a search warrant for Green's residence was obtained. The police found a bandana substantially similar to the one Petrenko described as worn by the person or persons who robbed him, three baseball bats, a denim jacket with cloth sleeves, a small revolver, a magazine clip, and some ammunition for a different firearm. When Detective Schmitt went to the Blanche Road location where B.B. had indicated Green had hidden a pizza warming bag, he found one that Wismar identified as his. Approximately two weeks after Wismar had been robbed, he identified Green as his assailant from a photo array of six men. Green was indicted on four counts of aggravated robbery, felonies of the first degree, for the robberies on March 9th, 12th, 22nd, and 24th, and the counts of March 9th and March 24th contained firearm specifications. The case proceeded to a bench trial. The State provided no witness statements or victim interview summaries to Green prior to trial and Detective Schmitt testified that none existed; however, each of the robbery victims testified that, although they did not give the police a signed statement, the officers had interviewed them and made written summaries of those interviews.
 {¶ 13} At the conclusion of all witness testimony, the State, disclosing written narrative summaries of each of the victims' interviews, explained that Detective Schmitt "forgot he had [them]." Green's lawyer protested that the interview summaries should have been made available for purposes of impeachment under Crim.R. 16(B)(1)(f) and (g). The State responded with two arguments: that Green's lawyer had been advised of the contents of these statements in the course of pretrial conferences with the prosecutor and, as such, if he wished to use fact inconsistencies to impeach the victims' testimony, he possessed the information for use at trial; and that the interview summaries were not signed statements of victims, but rather, were the interviewing officers' notes of the interviews and, therefore, not subject to disclosure.
 {¶ 14} The judge permitted the introduction of the interview summaries into evidence. In making his closing argument/Crim.R. 29 motion for acquittal, Green's lawyer pointed out many factual inconsistencies between the testimony of Kantarovich, Yang, and Wismar and the interview summaries provided. Interestingly, Green's lawyer did not extensively argue that Petrenko's interview summary was prejudicially inconsistent with his testimony. At trial, as in his interview summary, Petrenko stated that he was robbed by two African-American men wearing blue and white bandanas on their faces, menacingly brandishing baseball bats, and that the assailant who stepped forward to actually demand and take his money was no more than six feet tall. Green's lawyer attempted to impeach this evidence by pointing out that Green is at least six feet six inches tall and that B.B., an admitted assailant, was not close to Petrenko, did not speak, and was clearly Caucasian.
 {¶ 15} The State argued that because Petrenko was at the top step of the porch of the Middleton Road house approximately three feet off the ground, looking down upon the robbers, his estimation of Green's height was necessarily skewed and understandable. It attributed Petrenko's mistaken recollection of B.B.'s race to the combination of darkness on the night of March 12th, the fact that the majority of both robbers' faces were covered by bandanas and the fact that B.B. stayed back a few feet from Petrenko and was more difficult to observe.
 {¶ 16} At the conclusion of all argument, the judge, noting uncontradicted testimony that the gun the State introduced into evidence was not an operable firearm, dismissed the firearm specifications from the indictments. As a result of the inconsistencies on in, respectively, Kantarovich's and Wismar's interview summaries, trial testimony and the other evidence introduced by the State, he acquitted Green on the indictments for the robberies of March 9th and March 24th. The judge also acquitted Green on the March 22nd robbery of Yang because of his concern over the State's lack of disclosure of the victim interview summaries. The judge theorized that many aspects of Yang's interview summary would have provided a defense attorney with questions or leads to other potentially guilty parties, to whom he may have hypothetically sought to shift the blame.
 {¶ 17} The judge did, however, find that the State proved beyond a reasonable doubt that Green committed the aggravated robbery against Petrenko on March 12th and, therefore, found him guilty on that count. Green moved for a new trial premised on the lack of disclosure of any victim interview summaries until the close of testimony, but it was denied because the judge ruled that Green had not shown prejudice resulting from the State's omissions. Green was sentenced to the mandatory, minimum three-year prison term, and his bond was continued pending disposition of this appeal.
 I {¶ 18} In the first of his three assignments of error, Green asserts that the State's failure to produce the victim interview summaries violated his constitutional rights because he was denied the opportunity to cross-examine witnesses relative to discrepancies between the accounts of the robberies given to interviewing officers and testimony at trial. Green had requested all exculpatory information in pre-trial discovery motions and confirmed the nonexistence of any victim statement summaries with the State. Each witness testified that, although he did not sign a formal statement, he did remember his interviewing officer creating a summary of the interview.
 {¶ 19} In Brady v. Maryland,[5] the U.S. Supreme Court stated, "the suppression by the prosecution of evidence favorable to an accused upon request violates [Fifth Amendment] due process [rights] where the evidence is material * * * to guilt * * * irrespective of the good faith or bad faith of the prosecution." In United States v. Agurs,[6] the Supreme Court extended the rule of Brady to apply to all obviouslyexculpatory evidence in the hands of the prosecutor, which "is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," even if there is no general or specific request for such exculpatory evidence.
 {¶ 20} "When reviewing assertions of prosecutorial misconduct in connection with the prosecutor's alleged suppression of evidence, the key issue is whether the evidence suppressed is material. Such evidence is material only if a reasonable probability exists that the result of the trial would have been different had the prosecution disclosed such evidence to the defense.[7] The `reasonable probability' test applies in all cases where the defense alleges that the prosecution improperly suppressed evidence, regardless of whether the defense specifically or generally requested the evidence or made no request for the evidence."[8]
A complaining defendant has the burden to show prejudice in the failure of a prosecutor to disclose allegedly exculpatory evidence.[9]
 {¶ 21} Crim.R. 16(B)(1)(f) places an affirmative duty on the prosecuting attorney to disclose evidence favorable to the defendant, and to do so prior to trial. Under Crim.R. 16(B)(1)(g), a witness's prior statement is discoverable after the person making the statement has testified only if an in camera inspection by the judge reveals that inconsistencies exist between the trial testimony and a prior statement; then the statement can be used on cross-examination. Crim.R. 16(B)(1)(g) provides in part:
 {¶ 22} "Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
 {¶ 23} "If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies. If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon."[10]
 {¶ 24} In the case at bar, after the State produced the interview summaries, the judge allowed their introduction into evidence. Green's lawyer extensively argued to the judge sitting as the trier of fact, that there were material inconsistencies between the physical description of the robber as reported by Kantarovich, Yang, and Wismar that cast reasonable doubt upon whether Green was actually the person who participated in their robberies. In acquitting Green of the robberies of Kantarovich and Wismar and on the robbery of Yang, the judge apparently accepted this argument.
 {¶ 25} He noted the general prejudice Green suffered as a result of the many inconsistencies in the Yang statement and his being deprived of it until after the close of testimony.
 {¶ 26} A judge's determination about whether any inconsistency exists is reviewed under the abuse of discretion standard.[11] "An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable."[12] If a defendant is denied the right to cross-examine a witness based on the witness's prior statement, a case will not be reversed if the reviewing court finds no inconsistencies between the testimony and the written report.[13]
 {¶ 27} Here, it is facially apparent that Petrenko's trial testimony was not inconsistent with his prior recorded interview summary,[14] and any attempt Green would have made at trial to cross examine on it would have been properly denied by the judge. Green, therefore, has not established the prejudice necessary to provoke reversal of his conviction on due process grounds, and this assignment of error has no merit.
 II {¶ 28} Green next submits that the State presented legally insufficient evidence to show, beyond a reasonable doubt, that he committed the aggravated robbery of Petrenko. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[15] Under Crim.R. 29: "The court on motion of the defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction on such offense or offenses."
 {¶ 29} Whether phrased in terms of a Crim.R. 29 motion, or in terms of a sufficiency of the evidence argument, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[16]
 {¶ 30} R.C. 2911.01 defines the elements of the offense of aggravated robbery, in relevant part, as follows:
 {¶ 31} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 32} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 33} "`Deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."[17]
 {¶ 34} B.B. testified that he and Green, brandishing baseball bats, confronted Petrenko and, without his permission, took $180 to $190 from him.[18] Petrenko also testified as to the general circumstances of the robbery itself, though he provided limited information as to the identities of the robbers. There can be no legitimate argument that a baseball bat is not an instrument that can cause the death of another and that if one believes the testimony of both B.B. and Petrenko, the bats were used as weapons and not for their normally intended purpose. The above testimony placed Green at the robbery scene, identified him as a perpetrator of a theft and established that he brandished a deadly weapon in the course of committing the crime. Therefore, the evidence against Green in the Petrenko robbery, if believed, would have been sufficient to convince a rational trier of fact of his guilt beyond a reasonable doubt. This assignment of error has no merit.
 III {¶ 35} Last, Green contends that his conviction is against the manifest weight of the evidence. In evaluating a challenge to the verdict based on the manifest weight of the evidence presented at trial, this court intrudes its judgment into proceedings which it finds to be fatally flawed through misinterpretation or misapplication of the evidence by a [factfinder] which has "lost its way."[19] This power is subject to strict and narrow constraints.
 {¶ 36} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" * * *
 {¶ 37} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[20]
 {¶ 38} Green, in defense of these charges, largely attacked the credibility of B.B., his prime accuser. He pointed out that, in his initial statement to the police, B.B. merely stated that he had been with "someone" during the commission of two robberies, which he later identified as the robberies of Petrenko and Yang. B.B. stated that he only implicated Green in those two robberies, and ultimately all four robberies for which Green was charged, after he learned that, in the Wismar robbery, Green had given Papa John's restaurant B.B.'s last name and his mother's cell phone number to identify the person placing the order. Green had argued that B.B.'s identification of him was nothing more than immature vengeance for the disagreement they had three days before B.B.'s arrest.
 {¶ 39} Green also placed great weight on the fact that the victims of all four robberies testified that their assailants were all substantially shorter than he. The State, specifically in the Petrenko robbery, countered that the victim was in a position that altered his ability to accurately gauge height. Moreover, combined with the generally stressful conditions incident to being robbed, at night over a relatively short time period in which to absorb the appearance of his robbers, Petrenko's errors in describing his assailants were understandable.
 {¶ 40} In announcing his verdicts in this case, the Judge stated that he found compelling the fact that, although the police had no reason to suspect him in connection with the Petrenko and Yang robberies, B.B., in the written statement after his arrest, admitted to participating in them. The judge noted other physical evidence, such as the bandana found in Green's home and the baseball bats seized from his garage, and the fact that two men robbed Petrenko, which facts corroborated B.B.'s and Petrenko's accounts of the incident. B.B. also provided testimony that establish his knowledge of other aspects of other robberies, such as the location of the Wismar's warming bag, which indicated that he either participated in the robberies or had specific knowledge about who did. Additionally, the judge specifically stated that he did not lend much weight to the height discrepancy in Petrenko's description of his robbers. Considering the plausibility of the State's theory of why Petrenko's estimation could have been made in error, we cannot disagree with this finding or its conclusion.
 {¶ 41} We cannot conclude from our evaluation of the evidence that the judge "lost his way" in determining, beyond a reasonable doubt, that Green participated in the Petrenko robbery. We overrule this assignment of error.
Judgment affirmed.
DIANE KARPINSKI, J., AND JOSEPH J. NAHRA, J., CONCUR.
(SITTING BY ASSIGNMENT: Judge Joseph J. Nahra, Retired Eighth District Court of Appeals)
[1] In observance of this court's policy of refraining from using the proper names of juveniles, we refer to this witness using his initials only.
[2] B.B. did assert that Green told him he committed the March 9th robbery in a written statement he gave police, but recanted this testimony at Green's trial.
[3] Whereas Kantarovich told an interviewing officer shortly after the robbery that his robber was almost six feet tall, he testified at trial that he recalled him being just a little taller than himself. Kantarovich testified that he is just under five feet, eight inches tall.
[4] It appears that, although the phone was registered in the name of B.B.'s mother, she purchased it primarily for her son's use.
[5] (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.
[6] (1976), 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392.
[7] Brady, supra.
[8] Id.
[9] State v. Jackson (1991), 57 Ohio St.3d 29, 565 N.E.2d 549.
[10] See also, State v. Scudder (1994) 71 Ohio St.3d 263,623 N.E.2d 524.
[11] State v. Clay (1972), 29 Ohio App.2d 206, 212, 280 N.E.2d 385.
[12] Blakemore v. Blakemore, supra.
[13] Daniels, supra, fn. 3; State v. Wirtz (July 29, 1993), Cuyahoga App. No. 62751, State v. Duncan (April 14, 1994), 1994 Ohio App. LEXIS 1554, Franklin App. No. 93APA11-1524, State v. Jackson (Sept. 17, 1988), Cuyahoga App. No. 52488.
[14] See statement of facts, supra.
[15] State v. Robinson (1955), 162 Ohio St. 486, 55 Ohio Op. 388,124 N.E.2d 148.
[16] See State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52,678 N.E.2d 541; State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492.
[17] R.C. 2923.11(A).
[18] Theft Offense R.C. 2913.02.
[19] State v. Thompkins, supra.
[20] State v. Thompkins, supra at 387, 1997-Ohio-52, 678 N.E.2d 541, (internal cites omitted).